537 So.2d 276 (1988)
Sedonia W. SPARKS
v.
TULANE MEDICAL CENTER HOSPITAL AND CLINIC.
No. 88-CA-0893.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 1988.
Writ Granted February 24, 1989.
*277 Dale C. Wilks, New Orleans, for plaintiff.
Edward A. Rodrigue, Jr., Robert I. Baudouin, Boggs, Loehn & Rodrigue, New Orleans, for defendant.
Before BARRY, CIACCIO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
Plaintiff, Sedonia W. Sparks, appeals from a trial court judgment denying her worker's compensation benefits. Plaintiff instituted this action seeking compensation benefits from her former employer, Tulane Medical Center Hospital and Clinic (Tulane), claiming that she was disabled from working due to extreme headaches and severe depression as the result of work related/induced stress. The trial court found that no accident had occurred and therefore plaintiff was not entitled to compensation.
Plaintiff began working for Tulane in November, 1980. She worked in the distribution department which was responsible for distributing medical supplies to hospital and clinic units. In 1984 plaintiff was promoted to manager of that department. The general stores department managed the storeroom where the hospital supplies were stocked. Plaintiff testified that when she first began working at Tulane marijuana was being smoked in the storeroom. She also claimed that she saw a storeroom employee, Calvin Green, give someone a small white package in exchange for money. She later confronted Green, apparently assuming that the exchange had been an illicit drug transfer. This occurred in either late 1981 or early 1982.
Plaintiff testified that beginning in 1982 someone began stealing things from hera pair of shoes, a radio, and a lamp. Once someone stole all of the time cards of her employees. On another occasion someone stole just a few of the time cards. Other acts were also perpetrated. Toward the end of 1983 someone urinated in plaintiff's coffee pot and put it under her desk. This was done over one weekend and discovered on Monday morning. Someone also urinated in an office wastepaper basket on one occasion and in 1985 and 1986 someone poured water into supply bins, ruining sterile items. The coffee pot and supply bin incidents, as well as the time card thefts, were reported to the Tulane security department. Also, each was confirmed by at least one other employee who testified at trial. Several employees also testified that they had observed marijuana smoking or smelled marijuana smoke in the storeroom.
Stocking of the storeroom shelves was a duty shared by the distribution department and the storeroom department. The distribution department was supposed to stock *278 the shelves Monday through Friday. The storeroom department had a couple of employees who would come in over the weekend to stock the shelves for Monday, or to stock whatever the distribution department had not stocked during the previous week. Friction apparently developed between the two departments over job responsibilities. The weekend storeroom workers felt the distribution department was not stocking the shelves during the week as they were supposed to. This meant more work for those stocking over the weekend. Some storeroom employees felt that the plaintiff unduly harassed them, always finding problems with their work. Some time around the last few days of March or the first few days of April a meeting was held where the problems were aired but apparently not resolved.
On Monday, April 6, 1987, plaintiff arrived at work to find that the shelves had not been stocked over the weekend. The two employees responsible, Calvin Green and Terry Givens, later admitted that they intentionally failed to stock the shelves and did so as a sort of protest against what they felt was the uneven division of shelving responsibilities.
The plaintiff immediately complained to Eddie Spiller, the storeroom manager and supervisor of Green and Givens. Spiller notified Harold Davis, Jr., the assistant director of materials management, and a meeting was held. At the meeting it was decided by Davis that he was either going to suspend Green and Givens for five days or terminate them. Spiller and the plaintiff argued over the way she treated his employees. Spiller admitted saying to plaintiff in a heated moment, "that's why there are a lot of people around here [who] want to kick your behind." The plaintiff, however, testified that Spiller said that if the men were suspended, "those guys were really going to get me." Davis went ahead and suspended Givens and Green. The plaintiff, upset by the "threats" and other work related problems, left work later that day, never to return.
She developed severe headaches and became deeply depressed as a result of the cumulative effect of the dissension at Tulane, the work stoppage, and her fear of retaliation which was undoubtedly heightened by the prior incidents of harassment. She didn't sleep that night and missed work the next day. That next day, April 7th, she went to see her physician, Dr. Dwight Green, an internist. Dr. Green testified that the plaintiff complained of headaches and depression. She was upset and crying, and related that she was having problems at work with certain people. Dr. Green diagnosed plaintiff to be suffering from tension headaches as the result of a depressive reaction to the stress she had been encountering at Tulane. He prescribed an anti-anxiety medication and told her to rest at home for one to two weeks.
On April 21, 1987 Dr. Green found plaintiff still experiencing depression and insomnia, and suffering from a loss of appetite. He recommended that she see a psychiatrist and referred her to Dr. Joseph Roniger. Dr. Green testified that he felt that the plaintiff was disabled because of her depression and headaches and felt she couldn't work, even as late as October, 1987.
On April 30, 1987 plaintiff saw Emily Jahncke, a social worker with Dr. Roniger's office. Ms. Jahncke was qualified by the court as a clinical social worker. Plaintiff related to Ms. Jahncke that she was experiencing headaches and depression, and that she was having nightmares and not sleeping well. Ms. Jahncke testified that plaintiff informed her that someone had threatened her. She also related other problems she had been having at Tulane. Ms. Jahncke's treatment was directed to getting plaintiff over her depression and stable enough to return to work. She testified that by September 30, 1987, the plaintiff was ready to return to work.
Dr. Roniger did not treat the plaintiff but examined and evaluated her at the request of Ms. Jahncke. Dr. Roniger diagnosed plaintiff to be suffering from an adjustment disorder with depressed mood. Dr. Roniger recalled that plaintiff was concerned about drug use or distribution at Tulane. She was stressed and also fearful *279 of those engaged in this activity. It must be remembered that Calvin Green, one of the employees who failed to stock the storeroom shelves, had been confronted by plaintiff years earlier regarding suspected illegal drug activity. It was Dr. Roniger's opinion that the cause of plaintiff's psychological condition was "definitely" job-related. Although Dr. Roniger never specifically evaluated her for disability he felt that at some point the plaintiff was disabled by whatever was happening to her at work. An employer's report of occupational injury or disease was signed by Dr. Roniger. The report was dated July 16, 1987, and stated that the plaintiff was suffering from an adjustment disorder with depressed mood and was expected to be able to return to work within eight weeks.
Defendant elicited from several witnesses, testimony that plaintiff had had prior mental problems and headaches. Dr. Green testified that he first examined the plaintiff on March 3, 1986 at which time she also complained of depression and headaches. Between this time and April 7, 1987 Dr. Green saw her twelve times for various reasons. On February 5, 1986 plaintiff also telephoned a local medical clinic complaining of an injury to her head. It appears that she had been punched in the head by someone. Two days later, on February 7th, she was seen by a physician complaining of severe headache due to trauma. But Dr. Green did testify that the April, 1987 headaches were caused by stress and emotions, not trauma.
Evidence also showed that in 1970 plaintiff was diagnosed as suffering from acute and chronic psychoneurotic depression, apparently due to an unwanted pregnancy. She was given a therapeutic abortion because her mental state was such that the pregnancy would gravely impair her physical or mental health. Ms. Jahncke, however, testified that she did not feel that a 1970 therapeutic abortion would have any significance with regard to her present condition. The plaintiff denied ever being diagnosed as suffering from psychoneurotic depression although she admitted having had an abortion in 1970.
From this evidence the trial court concluded that the plaintiff had been "disabled until September 30, 1987," but that she had "failed to prove an accident." Therefore, plaintiff was not entitled to worker's compensation benefits and her suit was dismissed.
On appeal plaintiff claims that the trial court erred in finding that she failed to prove an accident under the Louisiana Worker's Compensation Law. Plaintiff contends that the evidence establishes that she is entitled to temporary total disability benefits from April 6, 1987 until September 30, 1987 as well as reimbursement for her medical expenses. Plaintiff further requests that this case be remanded to the district court for a determination of whether she is entitled to a penalty and attorney's fees pursuant to La.R.S. 23:1201.2.
La.R.S. 23:1031 requires an employer to pay compensation benefits to an employee who "receives personal injury by accident arising out of and in the course of his employment." La.R.S. 23:1021(1) defines accident as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury." La.R.S. 23:1021(7) defines injuries and personal injuries as including "only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." The statute provides that the terms "shall in no case be construed to include any other form of disease or derangement, however caused or contracted."
Despite such restrictive statutory language Louisiana Courts have come to liberally interpret these terms. In the seminal case of Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972), the Louisiana Supreme Court reversed an earlier decision and held that there can be an accident and injury when a physical disability results solely from extraordinary mental or emotional causes. The court found no basis to distinguish between an injury occurring in the course of some physical exertion and one occurring because of emotional shock, fright, or stress. In Taquino v. Sears, *280 Roebuck and Company, 438 So.2d 625 (La. App. 4th Cir.1983), writ denied, 443 So.2d 597 (La.1983), this court extended the holding in Ferguson, ruling that an employee may be entitled to worker's compensation benefits solely as the result of a purely psychological or mental disability. In Taquino the plaintiff suffered a nervous breakdown, allegedly due to job-related stress resulting from more than one incident.
In Jones v. City of New Orleans, 514 So.2d 611 (La.App. 4th Cir.1987), writ denied, 515 So.2d 1111 (La.1987), this court refused to modify its holding in Taquino, supra and again held that a mental disorder unaccompanied by physical trauma may be disabling so as to entitle an employee to worker's compensation benefits. The facts of Jones differed from those of Taquino, supra, in that the plaintiff in Jones began experiencing serious psychiatric problems following a single incident. Thus, this court has found compensable job-related mental disabilities, "personal injury[ies] by accident," caused by (1) a single incident or occurrence, and (2) the cumulative effect of several stressful incidents.
In the case at bar the trial court found that the plaintiff had been disabled until September 30, 1987 but that there had been no accident. In making this finding regarding disability the trial court apparently accepted the testimony of Dr. Green and Emily Jahncke that plaintiff had been disabled from working. Dr. Roniger also felt that plaintiff had been disabled from working although he could not give a specific period of time. Defendant offered no medical evidence to rebut the testimony of these witnesses. We see a plaintiff who gives no indication or history of being a malingerer. We find the evidence furnishes a sufficient basis for the trial court's finding that the plaintiff was disabled until September 30, 1987, presumably from the last date she worked for TulaneApril 6, 1987. Such a finding cannot be considered clearly wrong. See Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring, 283 So.2d 716 (La.1973).
We also feel that the evidence establishes that the plaintiff suffered a personal injury by accident arising out of and in the course of her employment under La.R.S. 23:1031. We believe the trial court erred in applying a restrictive definition of accident to the facts of this case. In light of the broad construction of the terms "injury by accident" as interpreted by this court in Taquino v. Sears Roebuck and Company, supra, and Jones v. City of New Orleans, supra, we see no other result. The plaintiff endured numerous incidents of harassment at Tulane over six or seven years. These were perpetrated, apparently, by other hospital employees. This is in addition to the drug problems which plaintiff felt powerless to deal with. These things, the failure of Green and Givens to stock the shelves, and the revelation of what plaintiff could have reasonably believed was a threat, resulted in plaintiff suddenly experiencing an adjustment disorder with depressed mood. This result can be analogized to the nervous breakdown suffered by the plaintiff in Taquino, although in the case at bar the stress incidents were apparently spread out over a longer period.
We find the evidence furnishes an ample basis to establish a causal connection between plaintiff's disability and her employment. This was established by the testimony of her physicians and Ms. Jahncke. Although plaintiff had a psychiatric problem seventeen-years ago, there was no evidence whatsoever that this contributed to her nervous disorder and disability. It is true that she had experienced headaches and depression the year before April 6, 1987 but it is also true that she had been harassed throughout her term of employment. Any preexisting emotional scars plaintiff may have had do not act to sever or render incomplete a causal connection between her employment and disability. Plaintiff had been working satisfactorily until the April 6th incident. Despite all of the previous incidents of harassment she continued to perform extremely well, as evidenced by her yearly evaluations.
We find that plaintiff suffered a temporary total disability from April 6, 1987 to September 30, 1987 as contemplated by La. *281 R.S. 23:1221(1). She is entitled to payment of sixty-six and two-thirds percent of the wages she would have earned at Tulane during that period. Contained in the record are plaintiff's yearly merit evaluations. The last evaluation, dated November 17, 1985, reflects that her hourly wage was then $9.08. There is no evidence in the record to establish that she ever earned more than that. This works out to $363.20 per week, sixty-six and two-thirds percent of which, multiplied by twenty-five weeks and one day equals $6,102.07.
Plaintiff also seeks reimbursement for medical expenses she has paid or is responsible for as the result of her injury and disability. Under La.R.S. 23:1203 a defendant is responsible for these expenses. Contained in the record are bills for the two evaluations by Dr. Roniger totalling $150.00 and bills for treatment by Ms. Jahncke up to September 30, 1987 totalling $810.00. Dr. Green testified that his bills totalled $225.00 for treatment through October 13, 1987. We feel plaintiff is only entitled to reimbursement for medical expenses incurred through September 30, 1987, so we will deduct $25.00 from Dr. Green's bill. Also contained in the record is a pharmacist's computer printout of a list of medication dispensed to plaintiff from April 7, 1987 to August 26, 1987. It is unclear for what reasons much of this medication was prescribed for and we cannot award reimbursement for all of it. For instance, one of the items listed is a prescription for eyedrops from Dr. Green. There is no evidence that this is attributable to plaintiff's work-related disability. Two other prescriptions are from a Dr. Coignet who did not testify at trial. It is not known for what he treated plaintiff. We will give plaintiff credit for the cost of two prescriptions from Dr. Roniger and four prescriptions from Dr. Green for headaches, totalling $41.17.
Plaintiff was apparently a member of a health care plan as reflected by the pharmacist's computer printout. However, Tulane is not entitled to any credit or offset for the portions of her medical expenses paid by the plan. La.R.S. 23:1163; Bryant v. New Orleans Public Service, Inc., 414 So.2d 322 (La.1982); Theriot v. American Employees Insurance Company, 482 So. 2d 648 (La.App. 3rd Cir.1986).
Plaintiff also requests that this court remand this matter to the trial court for a determination of whether she is entitled to a penalty and attorney's fees pursuant to La.R.S. 23:1201.2. That statute provides for a penalty and attorney's fees when the employer arbitrarily, capriciously, or without probable cause fails to pay its employee's compensation claims within sixty days after receipt of written notice. Even though on review we have found that plaintiff was entitled to compensation benefits from April 6, 1987 to September 30, 1987, we are unable to say that Tulane's failure to tender payment of plaintiff's claims was arbitrary, capricious, or without probable cause. We reach this determination after considering the plaintiff's reports of headaches and depression as far back as March, 1986 and the peculiar nature and lack of clear outward manifestations of her psychological disabilities. The record is complete and it is unecessary to remand this matter to the trial court.
For the reasons assigned we reverse the judgment of the trial court and render judgment as follows:
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff, SEDONIA W. SPARKS, and against defendant, TULANE MEDICAL CENTER HOSPITAL AND CLINIC in the amount of SEVEN THOUSAND THREE HUNDRED THREE and 24/100 DOLLARS ($7,303.24), together with legal interest from date of judicial demand.
IT IS FURTHER ORDERED that all costs of court at the trial and appellate levels be assessed against defendant, TULANE MEDICAL CENTER HOSPITAL AND CLINIC.